IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2015 Session

**STATE OF TENNESSEE v. JOHN DANIEL SIMMONS**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-75    Monte Watkins, Judge**

_____

**No. M2014-02086-CCA-R3-CD – Filed November 20, 2015**
_____

John Daniel Simmons ("the Defendant") was indicted with two counts of sexual battery by an authority figure after he was alleged to have engaged in illegal sexual touching of K.L.[1]  Following a jury trial, the Defendant was convicted as charged.  On appeal, the Defendant argues that (1) the trial court erred when it permitted the State to call Daniel Burnell and Tony Pham as witnesses because the State did not give sufficient notice of its intent to call them as witnesses; (2) the trial court erred when it permitted David Estes to testify about hearsay statements made by Dewanna Williams; and (3) the evidence was insufficient to support his convictions.  Upon review of the record and applicable law, we conclude that the trial court committed reversible error when it permitted Mr. Pham to testify after allowing the Defendant only a few minutes in the middle of trial to speak with him.  Additionally, we conclude that the trial court committed reversible error when it admitted hearsay within hearsay during Mr. Estes's testimony.  We reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P.3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. THOMAS T. WOODALL, P.J., not participating.

Joel W. Crim, Nashville, Tennessee, for the appellant, John Daniel Simmons.

---

[1] Consistent with the policy of this court, minor victims of sexual offenses are identified by their initials.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Matthew Todd Ridley, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Kristin Menke and Nathan McGregor, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

*Motion to Exclude Witnesses*

The Davidson County Grand Jury indicted the Defendant with two counts of sexual battery by an authority figure of K.L. that allegedly occurred between June 1 and June 30, 2011. Although six witnesses were listed on the indictment, the list did not include two key witnesses who were ultimately called by the State to testify at trial— Tony Pham and Daniel Burnell.

On Monday morning, the first day of the trial, the Defendant filed a Motion to Exclude Undisclosed Witnesses, specifically Mr. Pham and Mr. Burnell. In that motion, the Defendant noted that neither Mr. Pham nor Mr. Burnell were included on the indictment and had not been previously subpoenaed. He claimed that he first received notice that the State intended to call Mr. Pham and Mr. Burnell as witnesses when the State sent an email to defense counsel at 5:10 p.m. the previous Friday. A copy of that email was attached to the Defendant's motion, and it reads, "I am sure you have all of these from last time but just to be sure . . ." and then listed the witnesses' names. The Defendant claimed that he did not have sufficient notice about the witnesses and asked the trial court to exclude Mr. Pham and Mr. Burnell from testifying.

At a hearing on the motion, the State noted that it had added Mr. Burnell to the subpoena list at the last hearing date for the Defendant's case and that Mr. Burnell had been interviewed by defense counsel. Regarding Mr. Pham, the State argued that the Defendant had notice of Mr. Pham as a potential witness because K.L. had mentioned him more than once in her forensic interview and identified Mr. Pham as the first person she told about the incident in her report to the detective. The Defendant countered that Mr. Pham was only identified as "a guy named Tony" in discovery. The State noted that K.L. spelled Mr. Pham's last name at the end of her forensic interview and identified the school that she believed Mr. Pham was attending. The Defendant confirmed that he had seen the video, but he maintained that he did not have sufficient notice that Mr. Pham was a potential witness in the case. The trial court stated, "Well, if [Mr. Pham] is going

to testify I will give [defense counsel] the opportunity to meet with him prior to that, if he chooses to meet with you."

On Tuesday, the first day of trial testimony, the State informed the court that one of the prosecutors had called Mr. Pham the night before and conducted a recorded interview with him and that interview had been provided to defense counsel immediately prior to court that morning. Defense counsel explained that he was unable to finish listening to the recorded interview, but he noted that "what the young man says is entirely inconsistent with what the victim reported . . . [.]" The trial court responded, "Well, I have heard that before."

*Trial Testimony*

K.L. testified that, in the summer of 2011, she was involved in the Youth Encouragement Services Program ("the YES Program"). She explained that the YES Program operated "almost like a daycare for teenagers"—the program took participants on field trips, fed them meals, and provided opportunities for physical activity. K.L. either walked or rode the program's van to the YES Program. The Defendant was one of the people in charge of driving the YES Program van. In addition to driving the van, the Defendant "would direct games, give lunch, and tell [the participants] what to do, basically."

K.L. recalled one instance when she had missed the van to go on a swimming trip. She called David Estes, the YES Program center director, and he gave her the Defendant's phone number so that she could ask the Defendant to come pick her up. After that communication, K.L. communicated with the Defendant "very, very rarely" via text messages. She stated:

> I do remember, there is one text message I do remember. But I don't know the full contents of it. But, I know that one of the text messages asked "Can I touch?" And I didn't know what he meant by that. So, I asked him, "What?" And, then, he sent back a winky face.

K.L. also recalled that the Defendant "was[] kind of[] a bully" to the other kids in the YES Program, but he was very nice to K.L. He would give K.L. "special privileges" such as allowing her to go into the kitchen[2] and letting her come back into games when the rules of the game dictated that she was "out."

K.L. described one day when she was alone in the YES Program van with the Defendant. K.L. was wearing shorts under a pair of baggy pants, and her pants were

---

[2] According to the YES Program policy, only students who were in high school were allowed to go into the kitchen. K.L. was not yet a freshman in high school during the summer of 2011.

sagging below her hips. The Defendant parked the van in front of K.L.'s house, leaned over to where K.L. was sitting in the front seat, and "grabbed [her] hand, slash, thigh— like both of those things at once." K.L. commented, "Well, I guess I should pull my pants up now," but the Defendant said, "No, don't." K.L. got out of the van and walked inside her house. K.L. explained that she did not tell anyone about the Defendant's comment because "it made [her] feel more confident in [her]self, prettier than what [she] thought [she] was." She said she liked the privileges and that she did not report the Defendant because she "wanted as much attention as [she] could get[.]"

In June[3] 2011, K.L. attended a lock-in with the YES Program at the Western Hills Church of Christ. She recalled that the evening started with the attendees making food and watching a movie in the chapel. After the movie, the attendees had a "nerf war," an activity where all the participants had "nerf guns" and one participant was designated the "weasel" and hid somewhere in the church while the other participants would "hunt down the weasel." K.L. and her friend, Tony Pham, were looking for the weasel and discussing Mr. Pham's girlfriend when the Defendant approached them and said, "I think I found them." K.L. said, "Okay, let's go," but the Defendant took her by the hand and led her in the opposite direction of where all the other game participants were going. The Defendant led K.L. through the chapel and into a room adjoining the chapel. Once inside the room, the Defendant "placed" K.L. against the wall and kissed her on the mouth. He also put his hand inside K.L.'s shirt and touched her breast and placed K.L's hand on his penis. K.L. left the room without saying anything as soon as the Defendant "was done." As K.L. left, the Defendant said, "[I]t's still on hard," which K.L. understood to mean the Defendant still had an erection. K.L. did not respond to his comment.

After the incident, K.L. told her friends, Tony Pham and Dewanna Williams, what had happened with the Defendant. She could not recall the specifics of what she told Mr. Pham and Ms. Williams, and she stated that they "never, really, talked about it" after that night. She recalled that the Defendant left the lock-in around 3:00 a.m. She did not tell any adults what had happened. K.L. continued to attend the YES Program for one to two weeks after the incident, and she attended the YES Program "sleep away camp" that summer. However, she explained that she would only ride in the YES Program van when it was absolutely necessary and that she stopped attending the YES Program because she did not feel comfortable going there anymore. After the incident, the Defendant stopped giving K.L. special privileges.

K.L. acknowledged that she was experiencing several emotional challenges when the incident occurred and that she would often act out, describing herself as a "rebel." At the beginning of her freshman year, K.L. began skipping school and then ran away from

---

[3] In her testimony, K.L. stated that the lock-in occurred in "June of 2011—July, sorry, 2011." However, other witnesses testified that the lock-in occurred in June of 2011.

home. Before she ran away, K.L. placed a note in her mother's purse explaining that she was running away because she did not like the way her mother was treating K.L. and K.L.'s younger sister. K.L. explained that she wanted her mother to realize that her actions hurt K.L. and that she wanted the note to strengthen her relationship with her mother. K.L. was gone for approximately nine hours before her aunt found her and brought her back home. However, K.L.'s mother did not react the way that K.L. had hoped. Instead, K.L. recalled that "Hell's gates were opened when [her] mom saw [her]" and family members had to restrain K.L.'s mother. K.L.'s mother called the police and had K.L. arrested on runaway charges. After K.L. was released from juvenile detention, she was grounded, and K.L.'s mother did not speak to K.L. or acknowledge her presence in the home for a week. One day, while her mother was at work, K.L. asked her step-father for permission to leave the house, and she attended a church activity with a family friend. At that time, K.L. told the family friend what had happened with the Defendant. When K.L. returned home, K.L.'s mother was furious and screamed at K.L. for leaving the house. Then K.L. "broke down" and told her mother what happened with the Defendant. K.L.'s mother then called the police. K.L. explained that she did not report the Defendant's actions earlier because she was afraid of retaliation by the Defendant or his family.

During cross-examination, K.L. described the Defendant as being in charge of the games at the lock-in. She recalled that the entire incident with the Defendant lasted "[m]aybe two minutes." Once he had placed her hand on his penis, he told her not to tell anyone and indicated that she should leave. After that, K.L. went to find Ms. Williams in the lock-in's designated sleeping room. K.L. was crying, but she was also "trying to keep [herself] cool." She told Ms. Williams and Mr. Pham what happened, but she did not tell anyone else until September, on the day her mother screamed at her for leaving the house.

Dewanna Williams testified that she was currently a senior in high school and that she had participated in the YES Program since she was in the third grade. She said that the Defendant was one of the YES Program staff members. Ms. Williams recalled that K.L. attended the YES Program during the summer of 2011. At that time, K.L. told Ms. Williams that she and the Defendant would text each other. On the night of the lock-in, K.L. told Ms. Williams that she and the Defendant "kissed a couple of times and she felt on him a couple of times." Ms. Williams recalled that K.L. described the Defendant touching her, but Ms. Williams could not recall what part of K.L.'s body the Defendant touched. Ms. Williams reported that her friend Bree[4] was the only other person in the room at the time K.L. told her about the incident. Ms. Williams described K.L.'s demeanor as she described the incident, stating, "We were talking, like, a normal

_____

[4] Bree's last name is not included in the record on appeal, so we must refer to her by her first name in this opinion. We intend no disrespect.

conversation, like, as friends." Ms. Williams said she did not think it was okay for one of the lock-in chaperones to kiss one of the students, but she explained that she did not tell anyone about what K.L. had told her because she "didn't know if it was true or not."

On cross-examination Ms. Williams said she had not seen any text messages from the Defendant on K.L.'s phone. She maintained that K.L. was not crying when she told her what had happened with the Defendant; instead, Ms. Williams recalled that K.L. was "acting normal" and did not seem upset. Ms. Williams said she did not know where Mr. Pham was when K.L. told her about the incident with the Defendant, but she maintained that he was not present for their conversation. After the night of the lock-in, Ms. Williams did not observe the Defendant treat K.L. differently than he did before the lock-in. Ms. Williams confirmed that the first time she told anyone what K.L. had told her at the lock-in was when police contacted her nearly a year later. On redirect examination, Ms. Williams confirmed that she told Detective Jason Mayo that she believed K.L. but did not think the Defendant would do something like that. She also explained that she did not want to testify in court because she did not know what had happened. She denied being afraid that either K.L. or the Defendant would retaliate against her.

David Estes testified that he was the center director for the YES Program's location in west Nashville. Mr. Estes explained that the Defendant started volunteering with the YES Program in 2006 and was promoted a few years later to a staff member position. As a volunteer, the Defendant acted as a supplement to the staff and would "fill in the gaps" where staff members could not perform duties, such as tutoring a child, helping with the "open gym," or running errands. When the Defendant became an employed staff member, he took on a more "supervisory role" and performed duties such as running a kickball game, supervising the reading program, or ensuring the food was ready for the program participants. The Defendant also drove the van route to pick up program participants. Mr. Estes explained that the YES Program van policy stated that any staff member driving the van should avoid being "one-on-one" with a child in the van. To that end, staff members were instructed to try to ensure that the last stop on the van route was a family with more than one child so that the driver was not alone with a program participant. On occasions when the last stop only had one child, Mr. Estes said the best policy was to ensure the child was a high school aged male to avoid suspicion of impropriety. Mr. Estes explained that texting between program participants and the staff members should be minimal and restricted to communications about the YES Program, such as confirming a participant's attendance for an upcoming event. In the summer of 2011, the Defendant was employed as a staff member and drove the van route.

In September 2011, Mr. Estes received a call from K.L.'s mother, who informed him that K.L. had run away and when she returned she made allegations against the Defendant. Mr. Estes told K.L.'s mother to call the police. That evening or the next day,

Mr. Estes went to K.L.'s home. He recalled that he spoke with K.L.'s mother and step-father when he went to their house, but he could not recall if he spoke with K.L. During that meeting, Mr. Estes learned that the incident happened at the lock-in at Western Hills Church of Christ and that K.L. had confided in Ms. Williams and Mr. Pham. Mr. Estes confirmed that he spoke to Ms. Williams about the event.

The State then asked Mr. Estes, "What, if anything, did [Ms. Williams] say to you?" The Defendant objected to hearsay, and the trial court sustained the objection. Immediately following the trial court's ruling, the State asked, "Did [Ms. Williams] corroborate for you the allegation—[.]" The Defendant again objected to hearsay, and the trial court held an in-chambers conference.

The State presented several unclear arguments during the in-chambers conference. However, it appears that the State offered Mr. Estes's testimony regarding Ms. Williams' statement about what K.L. told her as a prior consistent statement by the victim. The State claimed Ms. Williams' statement to Mr. Estes was not offered for the truth of the matter asserted but to show that the victim disclosed the event before her motive to lie—to escape punishment from her mother—arose. The Defendant noted that Ms. Williams' testimony during trial—that K.L. was not upset when she told Ms. Williams about the Defendant's action—was inconsistent with K.L.'s account of the disclosure. Consequently, the Defendant argued that Ms. Williams' statement to Mr. Estes was only being offered to bolster Ms. Williams' testimony. The trial court noted that a limiting instruction would be required, but it allowed the State to question Mr. Estes about Ms. Williams' statement "with respect to [the victim's] motive [to lie]."[5]

After the in-chambers conference, Mr. Estes confirmed that he spoke with Ms. Williams because K.L. had disclosed the incident with the Defendant to Ms. Williams. Then the following exchange occurred:

[THE STATE]: And, generally, what did [Ms. Williams] say to you?

[MR. ESTES]: She told me that [K.L.] came to her at the lock-in and said that, you know, that that had happened.

[THE STATE]: That that had happened? What had happened?

[MR. ESTES]: That [the Defendant] had touched her.

---

[5] It is not clear from the transcript why the trial court admitted Mr. Estes's testimony about Ms. Williams' statement. However, from our review of the record, we believe Mr. Estes's testimony was admitted as a prior consistent statement of K.L. to rebut her motive to lie.

[THE STATE]: So she, basically, [Ms. Williams] was saying to you, that she had gotten that information from [K.L.] contemporaneous with the lock-in, with everything that is alleged to have occurred taken place?

[MR. ESTES]: That is correct.

The trial court did not give a limiting instruction for Mr. Estes's testimony regarding Ms. Williams' statement.

On cross-examination, Mr. Estes explained that the YES Program staff members, such as the Defendant, would not discipline program participants without first consulting with Mr. Estes. The form of punishment was left to Mr. Estes's discretion, although the staff members would sometimes execute the punishment. However, Mr. Estes clarified that staff members may exercise their own discretion to address "minor offenses." Mr. Estes recalled that K.L. had some minor disciplinary infractions—such as dress code violations—during her participation with the YES Program.

Mr. Estes stated that he did not observe any unusual behavior between K.L. and the Defendant after the lock-in and he was unaware anything had happened until he learned of K.L.'s allegation. As a result of the allegations, Mr. Estes terminated the Defendant's employment with the YES Program, and he suspended K.L.'s participation in the program.

Tony Pham testified that he met K.L. first through social media and then at the YES Program. Mr. Pham attended the lock-in at Western Hills Church of Christ in June 2011. Mr. Pham recalled that he was hiding with a group of friends during the "nerf war" and that he did not see K.L. at that time. Mr. Pham saw K.L. after the "nerf war" had ended. Mr. Pham had gone into the "teen room" after the game, and K.L. came to find him. At that time, K.L. told Mr. Pham that "something bad happened"—that she and the Defendant had been separated from the group and that the Defendant was asking her to do "[s]exual stuff." Mr. Pham could not remember what type of "sexual stuff" K.L. said the Defendant wanted her to do. Mr. Pham said, "I didn't, really, believe [K.L.]. I was in shock." After K.L. told him what had happened, Mr. Pham went to sleep. Mr. Pham could not recall anyone else being in the room when K.L. told him what had happened. He had no specific memory of Ms. Williams being present for K.L.'s disclosure, and he did not remember seeing Ms. Williams at the lock-in. Mr. Pham could not remember if the Defendant left the lock-in before it was over. However, he explained that he could remember what K.L. had told him because "it was on [his] mind for days after the lock-in." Nevertheless, he did not tell anyone else what K.L. had told him, even when he learned why the Defendant had been terminated from his position with the YES Program. Mr. Pham emphasized that "[he] didn't do anything after [K.L.] told [him] that night, because [he] was shocked about it; wasn't sure, wasn't real."

- 8 -

On cross-examination, Mr. Pham stated that the first time he spoke to law enforcement was the day before he testified when he was told to come to court.[6] Mr. Pham said he had spoken with Mr. Estes "a long time ago" when Mr. Estes was conducting an internal investigation. However, Mr. Pham maintained that his testimony was the first time he had ever told anyone about what K.L. had told him. Mr. Pham recalled that the Defendant was a member of the YES Program staff. He did not remember seeing the Defendant with K.L. at the lock-in. Mr. Pham did not remember talking with Ms. Williams on the night of the lock-in, and he denied sharing any information about his personal life with K.L. that night. Mr. Pham recalled that K.L. was "kind of upset" when she told him about what happened with the Defendant. Mr. Pham explained that he did not tell anyone at the lock-in about what K.L. had told him because he was "in shock" and he did not believe it. Later, he heard other people discussing it, and "that's when [he] realized . . . that it was probably real."

On redirect examination, Mr. Pham admitted that, when he spoke with Mr. Estes about K.L.'s allegations, he told Mr. Estes that K.L. had told him "something sexual" in the form of touching had happened between her and the Defendant. He explained that he had forgotten about that conversation when he stated earlier that his trial testimony was the first time he had told anyone about his conversation with K.L. Mr. Pham did not remember telling anyone else about K.L.'s allegation.

Daniel Burnell testified that, at the time of the lock-in, he was the youth minster for Western Hills Church of Christ and he worked part-time with the YES Program. Mr. Burnell organized the lock-in in the summer of 2011 and gathered people to serve as chaperones. Mr. Burnell did not ask the Defendant to serve as one of the chaperones at the lock-in, but he noticed that the Defendant was present near midnight. Mr. Burnell noted that he was "a little bit worried" about the Defendant's presence at the lock-in because the Defendant had a tendency to act immaturely and get the "kids fired up." Mr. Burnell was concerned that the Defendant would do the same thing the night of the lock-in. However, Mr. Burnell was not concerned enough to ask the Defendant to leave. Mr. Burnell also noted that the Defendant was not instructed to stay away and Mr. Burnell had anticipated that the Defendant may come to the lock-in despite the fact he was told he was not needed. The Defendant left between 2:30 and 4:00 a.m., before the lock-in was over, because he was "really tired" and wanted to go home to sleep. Mr. Burnell "didn't think anything of it." Later, Mr. Burnell learned from Mr. Estes about K.L.'s allegations. The Defendant called Mr. Burnell and said, "Buddy, you know I didn't do this." Mr. Burnell told the Defendant that he was not accusing him, but he explained that the Defendant could not return to Western Hills Church of Christ as a safety precaution.

---

[6] Based on this testimony, it appears that Mr. Pham first learned about the legal proceedings in this case on the same day that the Defendant filed his motion to exclude Mr. Pham as a witness.

On cross-examination, Mr. Burnell stated that he had instructed the chaperones at the beginning of the night that none of them were allowed to be alone with one of the children, but the Defendant was not present for that instruction. Mr. Burnell also acknowledged that the Defendant was placed in charge of the "nerf war" and, if someone won the game, they would come tell the Defendant. As such, Mr. Burnell did not think it would have been easy for the Defendant to disappear during the game. Mr. Burnell denied that anyone indicated there was a girl crying at the lock-in or that anyone told him something "amiss" had happened.

Detective Jason Mayo of the Metro-Nashville Police Department testified that he did not speak to anyone from the YES Program as part of his investigation; instead, representatives from the Department of Children's Services talked to the YES Program staff. Detective Mayo interviewed the Defendant and "got the disclosure" from K.L. as part of his investigation. He knew there were several people present at the lock-in, but he did not attempt to interview any of them because they did not witness the alleged assault. However, he did interview Ms. Williams because she was the first person to whom K.L. made a disclosure. Detective Mayo explained that he was not concerned that Ms. Williams' statement differed from the details of K.L.'s disclosure because Ms. Williams confirmed the basics of K.L.'s disclosure that touching and kissing occurred, "which is what [Detective Mayo] was mainly concerned with at the time." Detective Mayo explained that he did not challenge the veracity of K.L.'s allegation because her statements had been consistent and Detective Mayo did not have any reason to doubt her. Detective Mayo also spoke with Mr. Pham via telephone on the Monday of the week of trial. On cross-examination, Detective Mayo explained that other people were also investigating the case and talking to various witnesses and he was privy to all the information they uncovered.

The jury convicted the Defendant as charged for both counts. The trial court sentenced the Defendant to concurrent, six-year sentences. This timely appeal followed.

## Analysis

### A. Late-Disclosed Witnesses

The Defendant argues that the State acted in bad faith when it waited until 5:10 p.m. on the Friday before a Monday trial to disclose its intent to call Mr. Burnell and Mr. Pham as witnesses. He also contends that the trial court's failure to exclude the witnesses placed the State at an unfair advantage and resulted in prejudice to the Defendant. The State notes that the Defendant admitted to seeing the video of K.L.'s forensic interview, wherein she spells Mr. Pham's last name, and argues that the Defendant had failed to show that he was prejudiced by the late disclosure of Mr. Pham as a witness. We agree with the Defendant that the State's actions amounted to bad faith.

Tennessee Code Annotated section 40-17-106 provides that:

> It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the indictment or presentment is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause, and sign each indictment or presentment name thereto.

Tenn. Code. Ann. § 40-17-106. "The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof." State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996). However, the statute is merely directory and does not impose a mandatory duty on the prosecutor. Id. Failure to include a witness's name on the indictment does not necessarily disqualify the witness from testifying. State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992). A defendant will be granted relief for nondisclosure of a witness "only if he or she can demonstrate prejudice, bad faith, or undue advantage." Kendricks, 947 S.W.2d at 883. In the context of an undisclosed witness, "it is not the prejudice which resulted from the witness' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice." Id. The decision of whether to allow the witness to testify is left to the sound discretion of the trial court. Id. (citing State v. Underwood, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984)).

In this case, the Defendant claims that the State first informed him of its intent to call Mr. Burnell and Mr. Pham as witnesses when it sent an email at 5:10 p.m. on the Friday before a Monday trial which stated "I am sure you have all of these from the last time but just to be sure…" and listed the witnesses' names. As to Mr. Burnell, the record indicates that the State informed the Defendant about its intent to call Mr. Burnell at a prior court date and that the Defendant had actually interviewed Mr. Burnell before the email was sent. Accordingly, we are unable to conclude that the State acted in bad faith or gained an undue advantage or that the Defendant suffered any prejudice regarding Mr. Burnell. The Defendant's claim that Mr. Burnell should have been excluded as a late-disclosed witness is without merit.

However, there is nothing in the record which shows that the Defendant was aware of the State's intention to call Mr. Pham as a witness prior to the 5:10 p.m. email. In a sexual abuse case in which the offense was not reported to authorities for over two months, it would seem that the witnesses to whom the victim contemporaneously reported the incident would be of paramount importance to the State's case. As such, it is difficult to imagine that the State did not intend to call those witnesses in its case in chief and should have timely disclosed those witnesses to the Defendant. Waiting until after normal business hours on the Friday before the trial was scheduled to start on Monday to disclose one of these important witnesses, and indicating that the witness had been

disclosed prior to that email, is so suspect as to imply bad faith. See State v. Anne K. Hosford, No. 03C01-0904-CC-00158, 1999 WL 358993, at *2 (Tenn. Crim. App. June 4, 1999) (holding that presenting the case to the grand jury after the State repeatedly failed to bring a prosecuting witness to the scheduled preliminary hearings and failed to object to other continuances of the preliminary hearing date was sufficient to dismiss the indictment because, even though the state's actions "may not have originated from malicious intent," they were "deemed to be in 'bad faith'" because they did "not 'abide the law' nor serve the ends of justice").

Further, the trial court's "remedy" for the State's late disclosure—allowing the Defendant a few minutes to speak with Mr. Pham in the middle of trial—was not sufficient to rectify the State's conduct. It is clear that the Defendant intended to highlight at trial the fact that K.L. did not disclose the alleged touching to any adult until she was in danger of being punished for running away and, consequently, that she may have had a motive to lie. Therefore, what K.L. contemporaneously told Mr. Pham was crucial for the jury to determine the veracity of her allegations concerning the alleged touching. To that end, Mr. Pham's recollection of the event and his credibility as a witness was vital to the State's case and of paramount importance to the defense. Mr. Pham's testimony about the lock-in and K.L.'s disclosure differed in key details from the testimony of K.L. and Ms. Williams. As such, the trial court abused its discretion when it allowed the Defendant only a few minutes in the middle of trial to speak with Mr. Pham before the State called Mr. Pham as a witness.[7]

Further, we are unable to classify the error as harmless. Because the Defendant raises this issue as a violation of a Tennessee statute, we address harmless error under a non-constitutional framework. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (stating the applicable framework for review when the error is "not of a constitutional variety"). Under the non-constitutional harmless error analysis, the defendant bears the burden of demonstrating "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Id. at 372 (quoting Tenn. R. App. P. 36(b)). The stronger the evidence of the defendant's guilt, the heavier the burden is on the defendant to prove that a non-constitutional error was not harmless. Id. However, harmless error analysis does not rest upon the question of whether there was sufficient evidence to support a defendant's conviction. Id. Instead, "the crucial consideration is

---

[7] We note that the Defendant was aware that K.L. disclosed the event to Mr. Pham because defense counsel viewed the video of K.L.'s forensic interview in which she tells the interviewer that she made a contemporaneous disclosure to "[her] friend Tony," spells Mr. Pham's last name, and identifies the school she believed he attended. However, in the context of an undisclosed witness, this court looks to the prejudice created by the lack of notice that the witness would be called, not the prejudice resulting from the witness's testimony. See Kendricks, 947 S.W.2d at 883.

what impact the error may reasonably be taken to have had on the jury's decision-making." Id.

In this case, we conclude that the prosecutor's bad faith and the trial court's failure to fashion an adequate remedy resulted in prejudice to the judicial process. As noted above, Mr. Pham's testimony was crucial for the jury to determine the veracity of K.L.'s allegations. The Defendant was not afforded a sufficient opportunity to prepare for and test Mr. Pham's testimony. Additionally, the only direct evidence against the Defendant was K.L.'s allegation and testimony. The remaining trial testimony was presented to establish when K.L. disclosed the incident to others and the result of her disclosure. Accordingly, we conclude that the prosecutor's bad faith and the trial court's failure to fashion a remedy sufficient to allow the Defendant to prepare for Mr. Pham's testimony resulted in prejudice to the judicial process and, therefore, constitutes reversible error.

### C. Admission of Mr. Estes's Testimony about Ms. Williams Statements

Next, the Defendant argues that the trial court erred when it allowed Mr. Estes to testify about inadmissible hearsay statements made by Ms. Williams regarding what K.L. had told Ms. Williams about the alleged touching. The State argues that the trial court properly admitted Mr. Estes's testimony as a prior consistent statement of K.L. and that it was not offered for the truth of the matter asserted.

We note that the State's arguments during the in-chambers conference were extremely confusing. At the conclusion of the in-chambers hearing, the trial court simply stated, "I am going to allow it with respect to motive." Based on this statement and the State's argument in the in-chambers conference, we believe Mr. Estes's testimony about what the victim told Ms. Williams was admitted by the trial court as a prior consistent statement of the victim.

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted therein." State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980).

As a general rule, evidence of a witness's prior consistent statements may not be used to rehabilitate the testimony of an impeached witness. Id. However, if a witness has been impeached on the ground that his or her trial testimony was a "recent fabrication" or resulted from an apparent motive to lie, evidence of the witness's prior

- 13 -

consistent statement is admissible to rebut the inference the that witness's testimony on direct examination was "the result of recent fabrication." State v. Carpenter, 773 S.W.2d 1, 10-11 (Tenn. Crim. App. 1989). However, prior consistent statements may not be admitted as substantive evidence, and the trial court should give the jury a limiting instruction that the statement may not be considered for the truth of the matter asserted. Braggs, 604 S.W.2d at 885.

Our supreme court has recently addressed the standard of review applicable to the review of hearsay statements:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.2d [739], 759-61 [(Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

The State sought to introduce evidence of K.L.'s prior consistent statement to Ms. Williams through the statement Ms. Williams made to Mr. Estes. In other words, the State was trying to introduce hearsay within hearsay. "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." Tenn. R. Evid. 805.

We will first address the admissibility K.L.'s statement to Ms. Williams. We acknowledge that the Defendant did impeach K.L. during cross-examination, and a central theory of his defense was that K.L. had fabricated the story in order to avoid getting into trouble with her mother. Normally, such circumstances would allow K.L.'s prior statement to Ms. Williams to come in as a prior consistent statement with a proper limiting instruction. See Carpenter, 773 S.W.2d at 10-11. However, because the trial court did not provide a limiting instruction in this case, K.L.'s statement to Ms. Williams

- 14 -

was offered as substantive evidence, and the jury was allowed to consider it for the truth of the matter asserted.  As such, admission of K.L.'s statement to Ms. Williams was error.  See Braggs, 604 S.W.2d at 885.

Second, we address the admissibility of Ms. Williams' statement to Mr. Estes. The State wanted Mr. Estes to confirm that K.L. made a contemporaneous disclosure to Ms. Williams, and in order for that to be proven, Ms. Williams' statement to Mr. Estes had to be offered for the truth of the matter asserted.  Therefore, it is hearsay.  The State has failed to provide any argument as to how Ms. Williams' statement to Mr. Estes falls within an exception to the hearsay rule, and we are unable to find an applicable exception.  Therefore, the trial court erred when it admitted Mr. Estes's testimony as a prior consistent statement of K.L.

Additionally, we are unable to classify the error as harmless.  Evidentiary errors are reviewed as non-constitutional errors.  See Rodriguez, 254 S.W.3d at 371.  Our standard for review for non-constitutional, harmless error analysis is outlined above.

In this case, whether K.L. made a contemporaneous disclosure of the incident was critical to the State's case.  Mr. Estes's testimony about what Ms. Williams told him would bolster the proof that K.L. made a contemporaneous disclosure.  We are unable to conclude that Mr. Estes's testimony about K.L.'s statement to Ms. Williams did not have an impact on the jury's decision-making that more probably than not affected the judgment.  See Rodriguez, 254 S.W.3d at 372.  Thus, the admission of the hearsay within hearsay constitutes reversible error.

### C. Sufficiency of the Evidence

The Defendant argues that the evidence was insufficient to support his convictions because he was not in a position of trust over K.L. and he did not have supervisory or disciplinary power of K.L. at the time of the incident.  The Defendant also notes that, at the time of the lock-in, he was "merely a volunteer" and that any alleged touching "was an event independent from [his] duties with Y.E.S."  Consequently, he concludes, "Assuming a touching did take place, it was not the product of his status."  The State argues that the evidence was sufficient for the jury to find that the Defendant held a position of trust and abused it to commit sexual battery.  Although we must reverse the Defendant's convictions and remand the case for a new trial, we will address the Defendant's challenge to the sufficiency of the evidence in the event of further appellate review and also because, if the Defendant's argument that he was not in a position of trust or power over the victim is meritorious, the conviction for sexual battery by an authority figure would have to be vacated and modified to a conviction for sexual battery, a lesser-included offense charged to the jury.  State v. Swift, 308 S.W.3d 827, 832 (Tenn.

- 15 -

2010); State v. John J. Ortega, Jr., No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *12 (Tenn. Crim. App. Apr. 23, 2015).

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in the indictment, sexual battery by an authority figure is defined as "unlawful sexual contact with a victim by the defendant or the defendant by the victim accompanied by the following circumstances: (1) [t]he victim was, at the time of the offense, thirteen (13) years of age or older but less th[a]n eighteen (18) years of age; [and] (3)(A) [t]he defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact[.]" Tenn. Code Ann. § 39-13-527(a)(1), (3)(A) (2010). The State must prove that the Defendant was either in a position of trust or that he had supervisory or disciplinary power over K.L.; the State is not required to prove both. State v. Brian Caswell McGrowder, No. M2013-01184-CCA-R3-CD, 2014 WL 4723100, at *9 (Tenn. Crim. App. Sept. 23, 2014), perm. app. denied (Tenn. Feb. 12, 2015).

In the jury instructions, the trial court charged the jury as follows:

For you to find the defendant guilty of [sexual battery by an authority figure], the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) the defendant had unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts, or the clothing covering the immediate area of the alleged victim's intimate parts; that the alleged victim had unlawful sexual contact with the defendant in which the victim intentionally touched the defendant's, or any other person's intimate parts, or the clothing covering the immediate area of the defendant's or any other person's intimate parts; and

(2) the victim was thirteen (13) years of age or older but less than eighteen (18) years of age; and

(3) that the defendant was, at the time of the alleged unlawful sexual contact, in a position of trust, and used such position of trust to accomplish the sexual contact; and

(4) that the defendant acted either intentionally, knowingly or recklessly.

Consequently, the jury was instructed to determine whether the Defendant accomplished the sexual contact through his position of trust and not through his supervisory or disciplinary power over the victim. Therefore, we will restrict our analysis to determine whether there was sufficient evidence to show that the Defendant was in a position of trust with K.L. and used that position to accomplish the sexual contact.

This court has previously addressed the "position of trust" language in the sexual battery by an authority figure statute by examining the sentencing enhancement factor of abuse of a position of trust. Brian Caswell McGrowder, 2014 WL 4723100, at *10. In order for this factor to apply, the defendant must first occupy a position of trust. State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999). Our supreme court has explained:

The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or the formality of the relationship, but upon the nature of the relationship.

State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996). Thus, to determine whether the defendant was in a position of trust, "the court must look to the 'nature of the relationship,' and whether that relationship 'promoted confidence, reliability, or faith.'" Gutierrez, 5 S.W.3d at 646 (quoting Kissinger, 922 S.W.2d at 488). Such relationships usually include a degree of vulnerability. Id. A defendant abuses his or her position of trust when the defendant exploits that vulnerability to achieve a criminal purpose. Id.

In this case, the record establishes that the Defendant was an employee of an after-school program for children and teenagers. In that capacity, he directed games, coordinated meals and snacks for the program participants, and drove the participants to and from the YES Program in a van. While the participants were at the YES Program, the staff was in charge of their welfare. The Defendant's position in the YES Program "promoted confidence, reliability, or faith." See id. Further, even though the Defendant was at the lock-in merely as a volunteer instead of a paid employee, it is clear that he was exercising many of the same duties and responsibilities he was tasked with as a member of the YES Program staff. Accordingly, the Defendant's relationship to K.L. was more akin to that of a teacher, coach, or babysitter as opposed to a friend or acquaintance. See State v. Edd Stepp, No. E2005-02178-CCA-R3-CD, 2006 WL 3102353, at *5 (Tenn. Crim. App. Nov. 2, 2006), perm. app. denied (Tenn. Jan. 29, 2007) (holding that the mere existence of friendship did not establish "private trust"). Viewing the evidence in the light most favorable to the State, the Defendant then used that position to lure K.L. away from the rest of her peers during the "nerf war" in order to achieve his criminal purpose. K.L. trusted the Defendant and followed him into a secluded area of the church. Therefore, the evidence was sufficient to support the jury's finding that the Defendant held a position of trust and abused it to commit sexual battery. The Defendant is not entitled to relief.

## Conclusion

For the aforementioned reasons, the judgments of the trial court are reversed and the case is remanded for a new trial.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 18 -